## Boyd County Fair Association, et al. v. Eastham, et al.

### (Decided February 13, 1925).

### Appeal from Boyd Circuit Court.

1. Corporations—Corporation Not Required to Issue Certificates to Subscribers Except on Latters' Demand.—A corporation is not absolutely liable to see that subscribers for stock receive certificates, since it is not required to issue them except on subscriber's demand.

2. Corporations—Subscribers Not Paying for Shares nor Demanding Certificates During Successful Management by Others Held Estopped to Claim Stock and Undivided Profits.—Subscribers to stock of county fair association who did not pay subscription or demand certificates, and took no part in management of the association, held under the evidence to be estopped and barred by laches from asserting some years later claims to stock and undivided profits of the corporation.

R. D. DAVIS and S. S. WILLIS for appellants.

MARTIN & SMITH for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The appellee, Paul H. Eastham, and four of the other individual appellees, filed their separate actions in the Boyd circuit court against the appellant and defendant below, Boyd County Fair Association, and its directors, by which they each sought to have themselves declared the owner of one share of the capital stock of defendant and to have it issued to them and for an accounting of the earnings, profits and dividends on the stock from the date of its subscription and the beginning of business by the company. The appellee, M. T. Newman, administrator of his father, T. S. Newman, also filed a similar action to obtain the same relief, alleging that his decedent subscribed for and was entitled to one share of the capital stock of the defendant fair association.

The cases were consolidated and the answer of defendants denied that any of the plaintiffs subscribed for or were entitled to a share of its capital stock and consequently were not entitled to an accounting as such stockholder. It admitted that each of the plaintiffs, including the decedent, Newman, had subscribed the original articles of incorporation in compliance with the statute relating to the formation of corporations, and that it was recited in those articles that the six plaintiffs, together with four others, were the subscribers for the entire capital stock of the company, which was fixed at $500.00; but it was averred that there was never any organization by the subscribers, in which the six plaintiffs participated, and that they never demanded or requested the issuing to them of any stock nor offered to pay for it, but that on the contrary they had abandoned the enterprise for which the company was formed and that others at a much later date came in and subscribed and paid for their stock and to whom certificates were issued, and also averred facts as constituting an estoppel against plaintiffs to obtain the relief sought by their petitions. Appropriate pleadings made the issues and upon final submission the court adjudged plaintiffs, excepting G. C. Richardson, against whom it sustained the estoppel, entitled to the relief prayed for by them, but did not adjudge an accounting and continued that branch of the case for future determination, and to reverse that judgment defendants prosecute this appeal, there being no cross-appeal by Richardson, whose petition was dismissed.

The facts, as undisputed, or those thoroughly established by the evidence according to our view of the record, are: That on July 21, 1916, a number of citizens of the city of Ashland met in the Elks' Hall in that city for the purpose of discussing and determining whether they would effect an organization for the purpose of holding a fair at Central Park in that city some time in the autumn of that year. A sort of temporary voluntary organization was attempted and either at that or a shortly subsequent meeting it was determined to hold the fair and certain committees were appointed, among which was one to draft articles of incorporation to be known as the Boyd County Fair Association. Mr. Clyde Levi, an attorney, was a member of the latter committee and he drafted articles of incorporation, fixing the capital stock at $500.00, with ten shares of the par value of $50.00 each, and inserted in the articles the names of

plaintiffs and four others as the owners of one share each
of the capital stock, and he procured the signatures to
those articles of the persons whose names he had inserted
as stockholders. The articles were acknowledged and re-
corded in the Boyd county clerk's office, but they were
not recorded with the secretary of state, as the statute
provides, until after the fair for that year was over.
Some of the plaintiffs and the other subscribers, as well
as a number of other enterprising citizens of Ashland,
actively promoted the first fair and assisted in the con-
ducting and management of it, one of whom was made
secretary of the voluntary association, it yet not having
been legally incorporated. It was not known for quite a
while whether the fair was a financial success or a fail-
ure, but in the spring of the next year (1917) there was
another voluntary meeting, which was duly advertised in
the papers, of the still voluntary association, which meet-
ing was attended by the active managers of the fair the
previous year and who had received pay for their ser-
vices from the receipts, and other citizens interested in
the continuance of the fair, but it does not appear that
any of the plaintiffs except Richardson attended that
meeting. At it the suggestion was made that persons
who desired or expected to become stockholders should
pay for their stock and have certificates issued to them.
At another meeting in August following and which plain-
tiffs did not attend, although it was likewise duly adver-
tised, other persons subscribed for the amount of stock
for which plaintiffs appeared as subscribers in the ar-
ticles of incorporation and such subscribers paid there-
for and had certificates issued to them; and following
that meeting the corporation was for the first time duly
and regularly organized by the election of a board of di-
rectors, which in turn elected a president, secretary and
treasurer and other officers necessary for the manage-
ment of the corporate business. After that another fair
was held in the fall of 1917, another in 1918 and yet an-
other in 1919. Before each fair, after the corporate or-
ganization, a prospectus was issued in which the names
of the officers, directors and perhaps stockholders ap-
peared, and ample opportunities were afforded by which
plaintiffs could, and we think they did, learn of the or-
ganization of the corporation with its newly acquired
stockholders, there being no contradiction or doubt about
that fact as to Richardson and Chatfield. Furthermore,
at none of the fairs following the first one did the plain-

tiffs take the active part that they did in the first one, nor did they appear to be influenced by the same amount of enthusiasm as they possessed at the beginning. Some of them became too busy with their other affairs, and the responsibility for making the fair a success was shouldered by others, of all of which plaintiffs had knowledge. After the close of the fair in 1919, it was determined to discontinue the enterprise, and at that time, after the payment of all outstanding accounts, including salaries and wages each year to the various officers to whom such payment was voted by the board of directors, there was a balance in bank to the credit of the corporation of $7,237.62, and before it was divided between the stockholders these various actions were brought in which an injunction was sought and obtained to prevent the corporation from dividing the net profits until the questions involved could be determined.

A great many questions are argued which we think are wholly foreign to the decisive question in the case which is: Whether plaintiffs under the facts of the record are in an attitude to come into a court of equity and obtain the relief which they are demanding? Among the numerous questions argued are, whether these proceedings are collateral attacks upon the organization of the corporation, and if so whether improper organization may be inquired into in such attacks; also what acts are necessary to constitute one a subscriber to the capital stock of a corporation and when may the latter sue its subscribers for the amount of the stock subscribed for by them, and many others which we have said are wholly unnecessary to a determination of the case. We think there is no doubt but that plaintiffs were at one time subscribers for the amount of stock set forth in the articles which they executed, and at that time they were entitled to pay for and demand their stock, but it does not necessarily follow that such right existed, because of the intervening facts, at the time they filed their respective actions. The whole duty does not rest upon a corporation to see to it that subscribers for stock receive their certificates, since it is not required to issue them except upon demand by the subscriber. Cook on Stockholders, vol. I, sections 61 and 192. And in this case there was never any demand by either of the plaintiffs for their alleged stock, until after the corporation had voted to abandon the business, which, as we have seen, was after the fair in 1919.

If there had been no change in either the situation of the corporation or with reference to others who came in and subscribed for the stock contended for herein, no doubt plaintiffs would have been entitled to have paid for their stock with interest from the time it should have been done and then been in position to demand the relief they asked. But the equitable principles of estoppel apply as well to cases of this kind as to others, and the text in 14 Corpus Juris 487, in dealing with the rights of original subscribers, who by their delay in attempting to assert them have caused others to acquire rights which would be materially affected by plaintiffs' recovery, says: "Thus a suit to compel a corporation to issue a certificate of stock to plaintiff and for an accounting for dividends will be barred by laches if plaintiff, with knowledge that his alleged right was not recognized by the corporation, had delayed for a long time to enforce his claim, and during this time material evidence has been lost to the corporation, or third persons have acquired rights which would be materially affected by plaintiff's recovery." It is true the text is purporting to deal with laches which is composed of a part of the elements of an estoppel, though little short of it (Klineline v. Head, 205 Ky. 644); but the facts in this case supply the additional elements to complete the estoppel.

The case of Snyder v. Charleston, etc., Bridge Co., 65 W. Va. 1, and reported in 131 Am. St. Rep. 947, had under consideration questions very analogous to the ones involved here. Plaintiff therein denied knowledge of the corporate meetings and other actions by it that were inconsistent with his being recognized as a stockholder, yet he admitted that he had "an 'inkling' of what was going on," and he occupied a much more favorable attitude to obtain the relief he sought than does any of the plaintiffs in this case, since the corporation was organized while he was a recognized stockholder and after he had paid for his stock. It appeared, however, on the corporate books, that he afterwards transferred his stock and he contended that the transfer was a forgery which he sought to have cancelled and himself reinstated as a stockholder. He did not seek relief until the rights of third parties had intervened and, because of his long silence and the intervening changes in the affairs of both the corporation and third parties, the court held him to be estopped, and in doing so said: "It would, therefore, seem that, if the doctrine of laches can ever be properly

invoked in defense of a claim, it is applicable with peculiar force in this case. The plaintiff delayed for six years to take any active steps for the enforcement of his right, knowing for at least five years of that time that he was not recognized by the said company as one of its stockholders. The rights of third parties would be materially changed, if plaintiff were to prevail.''

In the case of Perkins v. Union Buttonhole and Embroidery Machinery Co., 12 Allen (Mass.) 273, a subscriber of the original articles of incorporation moved away before he paid his subscription and before the corporation was organized and his stock was afterwards subscribed for and taken by another. Later on he sought the same relief which plaintiffs seek in this case, and in denying it to him the court said: ''We think that under the circumstances of the case his delay to perform the contract was unreasonable, and that they (defendants) were thereby released from all further obligation to him. As he had never assented to the organization of the corporation (the one actually organized) or to any of the acts done under it, they were authorized to treat him at that time as never having been a member.'' There is nothing in the cases of Owingsville and Mt. Sterling Turnpike Road Co. v. Bondurant, 107 Ky. 505, and Young v. Ashland Coal & Iron Co., 19 Ky. L. R. 491, inconsistent with the views herein expressed. On the contrary, in the Bondurant case the doctrine above announced was expressly recognized in this language: ''If the plaintiff's testator never owned the stock in question, or the right to assert claim thereto had been barred by the statute of limitations, *or he is estopped to claim it by reason of his long acquiescence,* then, of course, no recovery could be had for dividends on the stock.'' (Our italics.)

In this case plaintiffs resided within the city where the fair was held each succeeding year after the first one in which they participated and which itself was held before any incorporation. The succeeding ones were held after incorporation and the record discloses that sufficient publicity was given to notify all persons within the community, not only that the corporation had been perfected but that it had been done without the participation of plaintiffs, and upon the theory that they had abandoned their prior rights, whatever they may have been. They saw the fair conducted under their own eyes from year to year, and so far as they knew perhaps at a loss, but when they ascertained that there had been a profit,

after allowing reasonable salaries to those whose efforts made it a success, they seek the benefits of an original stockholder, notwithstanding they never demanded any stock and in effect withdrew from all active participation following the first fair. To allow them to recover under such circumstances would be, to our minds, in the face, not only of the doctrine of laches, but likewise that of equitable estoppel.

We, therefore, conclude that the court erred in rendering the judgment appealed from and it is reversed, with directions to dismiss the petitions.